## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

Oksana Babiy,

                Plaintiff

      v.

University of Rochester and
Mathew P. Haag, and
Catherine Nearpass

              Defendants

**18 CV 6214** FPG



---------------------------------------------------------------

## PLAINTIFF COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Oksana Babiy (Babiy) complain the Defendants UNIVERSITY OF ROCHESTER (the "University" or UR), Mr. Mathew P. Haag and Ms. Catherine Nearpass respectfully allege the following:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub.L.No. 102-166) (race, color, gender, religion, national origin).

1

2.    Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub.L.No. 102-166, and any related claims under New York law.

3.    Venue is proper within the Western District of New York in that the Plaintiff lives in Western New York and the acts and/or omissions giving rise to their claims occurred in Western District of New York.

4.    New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status).

## PARTIES

### Babiy

5.    I, Babiy is an individual and a citizen of New York. During the relevant period, and at all material times, I was employed by UR. I have been an employee of the University since October 21, 2008. My job performance was exemplary; I always received high reviews and had never been disciplined.

6.    In spring and summer of 2016, I was pregnant and was planning on taking medical leave after delivery. I had been promoted to an interim role of Administrative Assistant to Mr. Haag. I had applied for the permanent position on the recommendation from Mr. Haag and was well qualified since I had been performing in that role for some time. I was doing all the required tasks and never had any complaints. Mr. Haag failed to promote me and had hired a less qualified candidate.

### University of Rochester

7.    UR is a private educational institution and non-profit corporation with its principal place

2

of business at 500 Joseph C. Wilson Boulevard, Rochester, New York 14627. UR operates in an industry that affects commerce and employs 15 or more employees, qualifying as an employer for the purposes of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5). UR carries out one or more education programs or activities receiving Federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

## Haag

8.  Mr. Haag is an individual and a citizen of New York. During the relevant period, and at all material times, Haag was employed by UR. I was in my third trimester of pregnancy when Mr. Haag discriminated against me by failing to promote me and had hired a less qualified candidate. After I filed an official internal complaint, Mr. Haag retaliated against me and created a hostile work environment.

## Nearpass

9.  Ms. Nearpass is an individual and a citizen of New York. During the relevant period, and at all material times, Ms. Nearpass was employed by UR. Ms. Nearpass aided and abetted in discrimination and retaliation against me when she failed to properly address my honest complaint of pregnancy discrimination.

10.  Ms. Nearpass had conducted an internal investigation that was inaccurate, misleading, biased, and flawed. She had overlooked and omitted crucial pieces of my complaint and provided a subjective conclusion. Ms. Nearpass purposefully conducted an inaccurate investigation, omitted crucial facts that I had shared with her. Based on her inaccurate and misleading report, the conclusion was made that my complaint is without merit. By failing to uphold the Title VII laws and Policy 106, Ms. Nearpass had aided and abetted in the

3

discrimination against me and knowingly exposed me to retaliation.

11.    The University does not stand behind their own Policy 106, they purposefully conduct an inaccurate investigation and do not take responsibility of any wrong doing. They knowingly mislead investigative reports and fail to uphold and protect the constitutional rights of women.

## ADMINISTRATIVE PROCEDURES

12.    On May 2, 2017, Babiy timely filed a charge of pregnancy discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

13.    Notice of a right to sue letter was issued by the EEOC to Babiy on December 15, 2017, and this Complaint is filed within 90 days of said notice.

## STATEMENT OF FACTS

## Discrimination

14.    I am and have been an employee of the University since October 21, 2008. I started as a receptionist, was promoted to Secretory III / Wellness Activities Coordinator, then to Secretory IV, and in April of 2016 I was offered a position as an Interim Administrative Assistant (AA) to Mr. Mathew P. Haag, Associate Vice President for Clinical, Research and Academic Development at the University of Rochester.

15.    In April of 2016, I was in my second trimester of pregnancy when Mr. Haag's AA resigned, and Mr. Haag had selected me to fill the interim AA role, reporting to him.

16.    During the time I worked for Mr. Haag, I worked very hard, not only performing the duties of an AA, but also my former duties of a Secretary IV for our department in

Advancement. I never once received any major complaints from Mr. Haag or anyone else about my work performance. Instead, I was regularly complimented, and Mr. Haag even encouraged me to apply for the permanent AA position reporting to him during our one-on-one meeting, and he had suggested I reach out to Ms. Katherine Riecke, Advancement Talent Development Manager to work out the details.

17.    Shortly after my meeting with Mr. Haag, on June 20, 2016, I formally emailed Ms. Riecke my updated resume and told her that I was applying for the permanent AA position reporting to Mr. Haag. Ms. Riecke replied and scheduled two interviews for Wednesday, June 22, 2016; one with Mrs. Lily Gluzko, the Executive Assistant to Senior Associate Vice President for Advancement, and the other with Ms. Caitlyn Conway, the Assistant to Senior Associate Vice President for Advancement. Both of my interviews went very well, and the evidence submitted to the EEOC by the University (Position Statement), indicates that Ms. Riecke and Gluzko both, liked me and expressed that my interview went well. Only one other candidate was interviewed for this position, Ms. Damara Danko.

18.    On July 7, 2016, as I was entering my third trimester of pregnancy when Mr. Haag informed me that he decided to offer the position to the other candidate (Ms. Danko), because she was much more qualified than I, and that I would learn a lot from her since she has many years of experience. Mr. Haag also stated that if an Administrative Assistant position was to open in the future, I would be next in line to be promoted to it.

19.    I was offered to stay in my former position, which was significantly less in salary then the permanent AA position that I had been performing in for over two months.

20.    It is not unreasonable to conclude that Ms. Danko's status as a single woman in her mid-40's, who did not plan on having any children was the key qualification preferred by Mr.

Haag. At that time, I was clearly pregnant and in my third trimester. Mr. Haag was clearly aware that my delivery date was fast approaching and that I had plans to take Family and Medical Leave Act (FLMA) after my delivery.

21. Mr. Haag's suggestion to me to apply for the permeant AA position was just a formality to demonstrate that he was attempting to give me a fair chance, even though Mr. Haag's motives and statement their after clearly showed that he deliberately discriminated against me.

22. I was asked by Mr. Haag to train his new AA, Ms. Danko, before I left on pregnancy leave, and I noticed that she had little experience using advance Outlook Calendar and almost no knowledge of Microsoft Excel, which were both qualifications of the job. Ms. Danko did not know basic Excel skills.

23. At that time, some of my coworkers mentioned to me that they also noticed that Ms. Danko has no knowledge of advance calendaring, basic excel, or how to complete a basic expense report correctly; they were worried as to who was going to take over those tasks when I left on pregnancy leave.

24. Over two months of training by me, and others, Ms. Danko still was unable to complete a basic expense report correctly. If it was true that Ms. Danko's qualifications were as outstanding as claimed, she would have easily learned the policies and procedures of our organization in that period of time.

25. Of course, her lack of skills in advance calendaring and the use of basic Excel argues against those claims of superior qualifications. When I returned from leave in February 2017, almost all of my former coworkers expressed disappointment in Ms. Danko's lack of qualification and skill.

6

26. Mr. Haag discriminated against me by failing to promote me to the permanent AA position reporting to him when I was in my third trimester of pregnancy. He had passed me over in a job that I had already been performing in and was well qualified for. I was accomplishing all the required functions of the AA job, in addition to my other role without any performance complaints. In the Position Statement provided by the University, Mr. Haag admitted that he never had indicated to me any issues regarding my work performance while in the interim role.

27. My job performance was exemplary with no criticism from Mr. Haag or anyone else. In my almost ten years of working at the University, I always had good job reviews and was never disciplined. Mr. Haag failed to promote me and offered the position to a less qualified candidate, because of my pregnancy.

28. I suffered a significant cut in salary, the opportunity to receive better benefits, and the opportunity to advance my career. If I had received the salaried AA position that I was performing in, and since I had been employed at UR for over six years, I would have qualified for full pay during my whole pregnancy leave. However, in my current position I was only qualified for 6 weeks of full pay and anything after that would be at half pay.

29. In the spring and early summer of 2016, two of the male co-workers in my Department were promoted. Mr. Jared Longmore, who was an Assistant Director of Alumni Relations was promoted to Gift Officer and Mr. Anthony FitzSimmons, was a Secretary IV, just like me, and was promoted to Assistant Director of Alumni Relations in June of 2016.

30. I would like to question how debatable and unmerited it is to not promote me to the Administrative Assistant role using the basis that the other candidate is more qualified or has more experience and not apply the same rule to a male coworker who also, was a

7

Secretary IV and was promoted to Assistant Director. Most likely other candidates that applied to his role, some probably had more experience and were more qualified than Mr. FitzSimmons, but they decided to promote from within in his case, but not in my case.

31. On August 25, 2016, before my pregnancy leave, in an attempt to advocate for myself, I met with Ms. Mary Pat Walton, Executive Director at URMC Advancement to discuss my pay cut and that Ms. Danko was still not fully proficient at her job. I was still training her on how to use basic Excel and how to properly fill out an Employee Expense Reports, in addition to some calendaring skills. I felt that I should be better compensated, since I was still performing two roles and I was clearly more qualified. Ms. Walton suggested I reach out to HR and they would be able to explain to me how the pay structure works.

32. On September 13, 2016, I did meet with Ms. Holly Wolk from HR Advancement to talk about the pay structure and the fact that I was still training Ms. Danko in basic skills that she should have already picked up on. Ms. Wolk mentioned to me that Ms. Riecke had noticed that I was earning on the lower end of the pay scale for my paygrade, so she had brought it up to Ms. Wolks attention, and they had adjusted it so that I would be more in line with what others made in that position. Ms. Wolk stated that now, I was at the maximum side of the scale in that role. There was nothing else that she would be able to do for me at that time unless my role changed.

33. I was upset because right before my pregnancy leave they had significantly cut my salary, and I would no longer be qualified for better benefits and Mr. Haag failed to promote me and hired a less qualified person. In my pursuit to advocate for myself, I suggested if they would consider changing my role to a Program Assistant, who were salaried. Mr. Haag informed me that they had considered it, but at that time HR were not able to do so.

8

34.   I went out on pregnancy leave on October 3, 2016 and returned to work on February 22, 2017. Since my return from pregnancy leave, I no longer reported to Mr. Haag, but to his administrative assistant Ms. Danko, who was also assigned to do my yearly annual review. I had major concerns since it had been a little over a month that I began reporting to her, but she was required to review me for the full year. In addition, to the fact that I had trained her, and she herself had very little experience.

35.   On March 13, 2017, I had emailed Mr. Haag requesting a 15-minute meeting to voice my concerns over my annual review. More than two weeks pass by and I had not heard back from Mr. Haag. Since he failed to respond to my first email request, on March 28, 2017, I again emailed him requesting a quick meeting, to which he replied that he did not have a few minutes in his schedule to meet with me before the start of the review process in April. He indicated that I should be voicing my concerns to my new supervisor or take them to Ms. Holly Wolk at HR Advancement.

36.   I did reach out to Ms. Wolk with concerns over how unfairly I have been treated and how unjust it is to me to be reviewed by my new supervisor who I have only been reporting to a short time, and the fact that she did not know the job herself.

## My Internal Complaints

37.   On April 25, 2017, to be transparent, I decided to notify Mr. Haag of my complaint since he refused to meet with me and address my concerns in person. I emailed Mr. Haag my first official internal complaint. Mr. Haag suggested I reach out to Ms. Barb Saat in Human Resources.

38.   I did as Mr. Haag suggested and met with Ms. Saat. My meeting with Ms. Saat was not very productive; but she did ask me what I was trying to accomplish by filing a complaint. I

9

explained to her that by me being discriminated for my pregnancy, I was being held back on advancing my career, making a significantly higher salary and on having better benefits. I stated that I wanted to be compensated for the pay differential and loss of benefits for the past year and the opportunity to advance my career. Ms. Saat nodded, and offered to help place me in a position, like the one I was in, but in a different department, with similar pay grade and benefits. I told her I was not interested. I was not happy with the University's resolution and lack of response to my complaint, and on May 2, 2017, I filed an official complaint with the EEOC.

39. On May 1, 2017, Ms. Nearpass reached out to me via email asking to meet with me regarding my internal complaint. The following week we met to go over my complaint in great detail.

40. On June 29, 2017, I received a letter from Mr. Thomas Farrell, Senior Vice President for University Advancement informing me of the determination to my internal Policy 106 complaint. Based on Ms. Nearpass Report, Mr. Farrell concluded that there had been no violation of Policy 106.

41. On July 10, 2017, I submitted an appeal letter to Ms. Sasha Tulgan, Deputy to the President requesting that she reverses Mr. Farrell's decision based on the incomplete and inaccurate investigative report conducted by Ms. Nearpass.

42. The Nearpass Report was inaccurate, misleading and biased in many ways. Ms. Nearpass intentionally omitted main facts from my report that clearly demonstrated pregnancy discrimination and retaliation. She had overlooked crucial pieces of my complaint and provided a subjective conclusion.

43. On August 14, 2017, by letter Ms. Tulgan informs me that the findings of the

10

investigative report were credible and substantiated based on the evidence that she reviewed. She did not find any basis to amend or reverse those findings or conclusions that were made in the Nearpass Report or see any need for additional investigation.

44.    On December 26, 2017, the EEOC Boston Office emailed me a copy of the Position Statement issued by Senior Counsel, Ms. Sarah Snyder Merkel from the University in response to my complaint of pregnancy discrimination. In that report, Ms. Merkel alleges that I was not promoted because Mr. Haag was not happy with my work performance, but much of the evidence presented by Ms. Merkel in her report contradicts that statement.

45.    The evidence submitted in the Position Statement, by Ms. Merkel, indicates that Ms. Katherine Riecke conducted an initial review of resumes that were submitted and suggested interviewing the two strongest candidates. Mr. Haag and the University claim that I was not selected for the role due to my job performance, which is contradicted by the fact that I was one of the two strongest candidates interviewed for the role.

46.    In addition, it would make no sense for Mr. Haag to suggest that I apply for the permanent position, and then select me to be interviewed if he was not happy with my work performance.

47.    Finally, after Ms. Danko was hired, I was selected and trusted to train her in the AA position, indicating substantial confidence in my abilities. All of these facts contradict the University's position that my work performance was lacking.

48.    In addition, Ms. Merkel's Position Statement misrepresents the timing of key events relevant to this case. The AA position reporting to Mr. Haag was posted in April 2016, around the same time at which he offered me the interim position.

49.    Ms. Merkel's report claims that Mr. Haag was not happy with my work performance and

11

"Haag came to the conclusion that the position would need to be posted and that he would formally recruit for the role." (PS-p. 3). Ms. Merkel's report reverses this sequence of events; falsely indicating by means of Mr. Haag's statement that he concluded my eight-week work performance was inadequate, before I ever worked in the interim position.

50. In fact, Mr. Haag sent an email message to all his staff on April 29, 2016, indicating that his former Administrative Assistant's position was already posted along with another Sec IV position that was open at that time.

## **Retaliation Complaint**

51. I reached out to Ms. Nearpass via email stating that I had major concerns of retaliation against me. She scheduled a June 7th phone call and during that call, I explained to Ms. Nearpass that Mr. Haag was intimidating and retaliating against me. In addition, since he was the boss, he influenced a couple other colleagues to treat me unfairly and nitpick at my work; colleagues who prior to my complaint, never stated any criticism and regularly complimented me on my work. With no justification, my job performance started to be questioned. Mr. Haag had created an unbearable and hostile work environment to a point that I was planning on leaving my job at the University, because it was affecting my mental and physical health.

52. In May, I learned that starting June 1, 2017, I would be reporting to a new supervisor, Ms. Judy Ames, who also was just recently promoted shortly after my complaint was filed. Ms. Ames was a Program Assistant but was promoted to URMC Project and Support Coordinator and I officially began reporting to her the first of June.

53. In addition, shortly after my complaint, I learned that my desk would be moved three cubes over to a new position directly across from Ms. Ames new office. When I asked why,

12

my desk was being moved only a few feet down, I was informed that "she" (Ms. Ames) needs to keep a "better watch on me." I strongly felt retaliated against, because for no legitimate reason, they inconveniently moved my desk location and positioned me directly across Ms. Ames office. This is a clear display of intimidation and retaliation. This complaint was omitted from all UR reports.

54.    On June 1, 2017, I began reporting to Ms. Judy Ames. On that day, during our first formal one-on-one meeting, she implied to me that I was "not competent", which took me completely by surprise. I had just begun reporting to her, so Ms. Ames had almost no first-hand knowledge of my performance.

55.    I did follow up with an email to Ms. Ames, letting her know that the accusation she made towards me was not fair. Other supervisors have found me to be very competent and capable, and that there is no need to put me down without evidence.

56.    Ms. Nearpass knowingly omitted these above facts from her report and mostly focused on my complaint regarding my annual performance review. The fact that I had shared with her they move of my desk over three cubes for no valid reason, the fact that my new boss tried to intimidate me and degrade me on several occasions. These were clear displays of intimidation and retaliation that she conveniently omitted from her report.

57.    I also indicated in my appeal letter to Ms. Tulgan, Deputy to the President that Ms. Nearpass had neglected to mention many critical facts in her report; the fact that my desk was moved a few feet over and positioned directly across Ms. Ames new office. Disappointingly, Ms. Tulgan never addressed that issue in her reconsideration letter to me. In addition, Ms. Merkel also excludes these facts in the University Position Statement to the EEOC.

13

58. In my nine years of working for the University, I never had any issues with my annual performance review, except year 2017, with no justification, my job performance was questioned and contains inaccurate information. All of my past reviews were highly ranked. I had always been complemented on my professionalism, except for year 2017, where I was criticized about my communication style.

59. I was told that I "come across more informal, and that it could be misinterpreted for not taking work seriously". When I asked for an example, of how I am more informal then my colleagues, the only example Mr. Haag indicated was that I say the word "hey" at times when I address coworkers. No reasonable person would understand how the use of the word "hey" relates to me not taking my work seriously.

60. I also shared with Ms. Nearpass other information that she omitted from her report, such as the daily belittling and hostility that I was experiencing. I was made to feel like a criminal by constantly being watched and questioned about every move I made. I would be called into random unscheduled meetings, where I would be criticized for minor mistakes or inconsequential issues that do no justice in comparison to all the good work I performed on a regular basis, as documented in nine years of performance reviews.

61. Ms. Merkel states that "Haag sought to give Babiy an opportunity in that role, and felt that, if she performed well, he could simply offer her the permanent role rather than going through a recruitment and selection process". (UR Positon Statement to EEOC)

62. In an email on April 29, 2016, Mr. Haag reveled that he had already started recruitment for his AA role; how could he have judged my performance if I have not yet worked for him. My official first day was May 2, 2016.

63. In addition, if he sought to give me the opportunity to perform well, then it was also Mr.

14

Haag's responsibility to indicate areas in which I needed to improve and give me the opportunity to do so.

64. As Ms. Nearpass Report stated, "Haag admittedly did not, however, communicate with Babiy very directly or with any specificity that he had found certain aspects of her performance to be problematic." Mr. Haag's response is contradictory; he states that he wanted to give me a chance, but how, since he never communicated with me any issues in my work performance.

65. The University overlooks the fact that Mr. Haag was the boss and that he could control everything; and as the boss, it is Mr. Haag's duty to let me know if he wanted something different than what I was giving him.

## CLAIMS FOR RELIEF

66. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub.L.No. 102-166) (race, color, gender, religion, national origin).

67. New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status).

## COUNT I

## TITLE VII and NYSHRL - DISCRIMINATION, RETALIATION, AND HOSTILE ENVIRONMENT AGAINST BABIY BY DEFENDANT UNIVERSITY OF ROCHESTER

15

68.    Plaintiff repeats and realleges the allegations expressed above as if more fully set forth herein. Mr. Haag is an individual and a citizen of New York. During the relevant period, and at all material times, Haag was employed by UR. Mr. Haag discriminated against me when I was in my third trimester of pregnancy by failing to promote me in the position that I was already working in, and instead had hired a less qualified candidate. After I filed an official complaint, Mr. Haag retaliated against me and created a hostile work environment.

# COUNT II

## NYSHRL - AIDING AND ABETTING RETALIATION AGAINST BABIY BY DEFENDANT CATHERINE NEARPASS

69.    Plaintiff repeats and realleges the allegations expressed above as if more fully set forth herein. Ms. Nearpass aided and abetted in the discrimination and retaliation by conducting a misleading, incomplete and inaccurate investigative report. Ms. Nearpass purposefully omitted crucial facts that are relevant to this investigation and had conducted and written an inaccurate and misleading report. By failing to uphold the Title VII laws and Policy 106, Ms. Nearpass had aided and abetted in the discriminated against me and knowingly exposed me to retaliation.

### PLAINTIFF REQUESTS A TRAIL BY JURY

# RELIEF SOUGHT

WHEREFORE, having set forth the above-described legally sufficient causes of action against the Defendants, Plaintiff pray for the entry of Final Judgement against all Defendants jointly and

16

severally, for damages in an amount not yet quantified but to be proven at trial, for costs and

attorneys' fees, and for any other and further relief which is just and proper.

Respectfully submitted,

*Oksana Babiy*
03. 13. 2018

Oksana Babiy
Pro Se

9 White Tail Rise
Rochester, NY 14622
585.727.2922
sanababiy@gmail.com

17

In the spring of 2016, I was working as a Secretary IV at the Office of Academic Development and Alumni Relations at the University of Rochester, reporting to Matthew Haag, Associate Vice President. In April of 2016, his Administrative Assistant quit and Mr. Haag asked me to fill in as an Interim Administrative Assistant supporting him. At the same time, I announce that I am pregnant. In June, the Administrative Assistant position was posted and Mr. Haag encouraged I apply. Mr. Haag told me that I do a great job and he almost always promotes from with-in. I received a pay increase during annual review in July. I was grateful to him for the opportunity and I did enjoy my time working for Mr. Haag.

I was interviewed for the job along with one other women. I heard that a friend of his recommended her. The two of us were the only candidates that were interviewed for this position; I know this for sure because I was managing his calendar at that time. The day before Mr. Haag left on his two week vacation, he informs me during our one-on-one meeting that he offered the job to the other women interviewed, and she will start on the day he returns back to office from his vacation. He informed me that if an Administrative Assistant position was to open within our department, I would be next in line to be promoted to it. Mr. Haag said that the reason he decided to hire the other women instead of me was because she was much more qualified and that I would learn a lot from her. I was offered to stay at my Secretary IV job with a pay cut.

I would like to point out that around the same time in our department two male co-workers were also promoted in our team. Jared Longmore, who was an Assistant Director of Alumni Relations was promoted to Gift Officer and Anthony FitzSimmons, was a Secretary IV, just like me and he was promoted to Assistant Director of Alumni Relations in June of 2016. Please note, that Anthony is not a direct report to Mr. Haag, but I would like to point out that Mr. Haag did interview final candidates for this role since he is the top manager within the URMC Clinical and Academic Department.

I would like to question how debatable and unmerited it is to not promote me to the Administrative Assistant role using the basis that the other candidate is more qualified or has more experience and not apply the same rule to a male coworker who was also Secretary IV and was promoted to Assistant Director? I can't help but wonder that most likely other candidates that applied to his role, some probably had more experience and were more qualified than Mr. FitzSimmons, but they decide to promote from within in his case, but not in my case.

I had to train Mr. Haag's new Administrative Assistant Damara Danko, before my pregnancy leave, and I noticed that she had very little experience using Microsoft Excel and had no idea how to do a basic expense report in Excel; which were both qualifications of the job. I should point out that she was a new hire to the University of Rochester, so she did have to learn the policies of our organization, but she should have been able to use basic skills in Excel to fill out the necessary math that is required in a expense report. At that time, some co-workers within our department mentioned to me that she does not have the most basic skills that are required for this job, such as using Excel or doing advance calendaring. Over two months of training by me and by the Finance Manager, she was still not able to complete a basic expense report correctly. I should note that she did work hard and was trying her best to learn the skills that are required. Since I have returned from leave, she has shown much improvement. She is a pleasant and a friendly women, but she was not more qualified than me at the time of hire.

On September 13, 2016, I did make a complain to HR; about the huge pay cut I had to take and I pointed out that Ms. Danko was not fully proficient at her job and I was still training her in expenses and other basic skills, such as calendaring. Close to two months of training by me and by Finance Manager, Ryan Balys; she still was not able to complete an expense report correctly, on her own. HR dismissed my

Exhibit C - page 2

complaints and said that there was not much that they can do about my pay, since they have just increased it to the maximum someone in the current Secretary IV position makes. I checked in with Matt to see if he would consider changing my role to a Program Assistant, who are salaried and make more than me, but was told by him that HR is not able to do that at the time. I can't help but think that I would have gotten the job if I was not pregnant and did not have to go on leave.

I should acknowledge that during my role as in Interim Assistant, I was also performing my Secretary IV duties. Not only was I assisting Mr. Haag full time, but I was also supporting a Gift Officer, doing all of gift processing for the Academic side and submitting expense reports for the whole department. In addition, I only had one week to train with the former assistant before her departure. I think that I met expectations in my new role, since Mr. Haag never had any major complaints with me when I was assisting him.

I went out on pregnancy leave in October 3, 2016 and returned back to work on February 22, 2017. Much has changed for me since my return, I no longer report to Mr. Haag, but to his administrative assistant Ms. Danko, who will also be doing my yearly annual review. Please note how unfair it is for me to be reviewed by my new supervisor, who I trained. Also, please note that at this time it has only been a little over a month that I report to her, but yet she is required to review me for the full year; even during the time she was not employed and I was the interim assistant to Mr. Haag.

 I really wanted to meet with Mr. Haag and address these concerns, but unfortunately he refused to meet with me. On March 13, 2017, I had requested a 15 minute meeting via email with Mr. Haag to voice my concerns over my annual review and a few other items. More than two weeks past by and I did not hear back from Mr. Haag. On March 28, 2017, I again email him requesting for a quick meeting. Mr. Haag replied that he does not have time to meet with me before the start of the review process in April; and that I should be voicing my concerns to my new supervisor or take them to Holly Wolk at HR.

I have reached out to Mrs. Wolk on several occasions and brought up my concerns over how unfair it is to me to be reviewed by my new supervisor who I have only been reporting to a short time, and won't consider the time I spent as an Interim Assistant to Mr. Haag. I asked her if Mr. Haag would also be a part of my review. Mrs. Wolk did promise me that she'll make sure that Mr. Haag will comment on my review. Mrs. Wolk has been helpful to me in suggesting tips on how to approach uncomfortable situations with my new supervisor. I really do appreciate her advice, unfortunately I am not sure if she will be unbiased in regards to the discrimination complaint, since I know that she is a close friend of Mr. Haag.

Knowing the position that Mr. Haag has at the University of Rochester and the community, I was afraid and embarrassed to file a pregnancy discrimination complaint and thought I would be labeled as a troublemaker and would even have a harder time finding a good job within the University. With the current events and Mr. Haag's refusal to meet with me, I have no choice but to file a complaint.

I do love working in Advancement and enjoyed the time I spent working for Mr. Haag. I would like to have a better understanding as to what made me less qualified in obtaining the Administrative Assistant position to Mr. Haag, since I was already performing the role in addition to my other duties?  I can't help but think that I would have obtained the position that I was currently working in, if I was not pregnant and did not have to go on maternity leave.

My main concern is that I was discriminated and demoted on the bias of pregnancy. I ask that you please review and take my complaint seriously. I plan on filing a complaint with NYS Division of Human

Exhibit C - page 3

Rights if a reasonable investigation is not provided.  I look forward to a quick resolution. Thank you for your consideration to this complaint.


Sincerely,

Oksana Babiy

Exhibit C - Page 4

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Oksana Bably**
**9 White Tail Rise**
**Rochester, NY 14622**

From:  **Boston Area Office**
**John F. Kennedy Fed Bldg**
**Government Ctr, Room 475**
**Boston, MA 02203**

[ ]  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 525-2017-00498 | **Scott M. Kelley,** **Investigator** | (617) 565-3210 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kenneth An*

**Feng K. An,**
**Area Office Director**

DEC 15 2017

*(Date Mailed)*

Enclosures(s)

cc:

**UNIVERSITY OF ROCHESTER**
**Susan L. Wormer, Senior Counsel**
**263 Wallis Hall, Box 270040**
**Rochester, NY 14627**